UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

JESSENIA GUZMAN,                          :
                                          :
                          Plaintiff,      :
                                          :          1:13-cv-5445-GHW
          -against-                       :
                                          :          MEMORANDUM OPINION
CITY OF NEW YORK, *et al.*,                :          AND ORDER
                                          :
                          Defendants.     :

-------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  3/18/2015

GREGORY H. WOODS, District Judge:

Plaintiff Jessenia Guzman brought this employment discrimination action against the City of

New York, the New York City Police Department ("NYPD"), and various individual defendants,

alleging that Defendants discriminated against her based on her race, color, gender, and pregnancy,

retaliated against her, and created a hostile work environment, in violation of Title VII of the Civil

Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, as amended by the Pregnancy

Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k); the New York State Human Rights Law

("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*; the New York City Human Rights Law ("NYCHRL"),

N.Y. City Admin. Code § 8-101 *et seq.*; and 42 U.S.C. §§ 1981 and 1983.  Defendants now move for

summary judgment with respect to all of Guzman's claims.

I.        **Background**[1]

Guzman, who identifies herself as a black, Hispanic female, was hired as a police officer by

the NYPD in September 2000.  *See* Doc. 32, Declaration of Leah S. Schmelzer ("Schmelzer Decl."),

Ex. B (Deposition Testimony of Jessenia Guzman) ("Guzman Dep.") at 20, 126.  At all relevant

times, Guzman was assigned to the 24th Precinct and had the rank of Police Officer, which is the

---

[1] The following facts are derived from the exhibits attached to the parties' Rule 56.1 Statements of Undisputed Fact and
are undisputed.

lowest uniformed rank. *Id.* at 21-22. Except as noted below, Guzman's supervisors at the 24th Precinct were Sergeant Damian Garcia, a Hispanic male; Sergeant Daniel Herbert, a white male; Lieutenant Richard J. Khalaf, a white male; and Inspector Nancy Barry, a white female.

Guzman's claims in this case concern a series of work-related incidents spanning from July 2010 to May 2013 that she alleges were discriminatory. The Court will describe these instances chronologically.

In July and August of 2010, while Guzman was pregnant, she was assigned to work as a telephone switchboard operator in an area of the stationhouse that did not have air conditioning. *Id.* at 128-29. Neither Sergeant Garcia nor Lieutenant Khalaf was Guzman's supervisor at the time, and Inspector Barry had not yet been appointed as the commanding officer of the 24th Precinct. *Id.* Guzman complained to Dr. Gaetano Bello, an NYPD District Surgeon, about the lack of air conditioning, but was unable to obtain a change in assignment. *Id.* at 199. According to Guzman, Officers Danielle Foley, Nina Frykberg, and Joanne Greene, all of whom are white, were assigned "a nice little cushy office where they [could] perform their duties and not be stressed with the [telephone switchboard]" during their pregnancies. *Id.* at 166. Guzman's pregnancy in 2010 ultimately resulted in a miscarriage. *Id.* at 67.

On May 21, 2012, Guzman formally notified the NYPD that she was pregnant again. *Id.* at 93. At that time, Guzman had been pregnant for "only a few weeks." *Id.* at 100. On the morning of May 22, 2012, Lieutenant Khalaf instructed Sergeant Garcia to ensure that Guzman wore her police uniform to work. Schmelzer Decl., Ex. D (Deposition Testimony of Damian Garcia) ("Garcia Dep.") at 47-48. Lieutenant Khalaf gave this instruction because it was in accordance with

his understanding of "patrol guide procedure."[2]  Schmelzer Decl., Ex. C (Deposition Testimony of Richard J. Khalaf) ("Khalaf Dep.") at 67-68.

That day, Guzman was assigned to work as a telephone switchboard operator.  Guzman Dep. at 93.  She wore civilian attire to work.  *Id.*  In accordance with Lieutenant Khalaf's directive, Sergeant Garcia ordered Guzman to change into her uniform.  Garcia Dep. at 47.  Guzman initially objected to this order on the ground that the "pregnancy desk" had previously informed her that she was permitted to wear civilian attire to work, as she had apparently done during her previous pregnancies.  Guzman Dep. at 94.  Nonetheless, after Sergeant Garcia spoke to Lieutenant Khalaf and reiterated this order, Guzman attempted to comply with it and proceeded to a locker room to change into her uniform.  *Id.* at 95.

At that point, Guzman discovered that her pants did not fit.  *Id.*  She informed another officer of this fact and was directed to return to the locker room to try on a different pair of pants. *Id.*  Inspector Barry eventually sent a female sergeant, Sergeant Suzette Merkoski, into the locker room to "find out what was going on" with Guzman.  Schmelzer Decl., Ex. E (Deposition Testimony of Nancy Barry) ("Barry Dep.") at 24.  Guzman then began to experience anxiety and ultimately suffered an anxiety attack.  Guzman Dep. at 95, 100.  The Patrol Borough Manhattan North Investigations Unit subsequently conducted an investigation into this incident that substantiated allegations of misconduct against Guzman, finding that Guzman "was dressed in

---

[2] Specifically, NYPD Patrol Guide Procedure No. 205-27 states that pregnant police officers must "[c]omply with [NYPD Patrol Guide Procedure] No. 204-03, 'Uniforms,' as it relates to the wearing of the uniform."  Schmelzer Decl., Ex. P at ¶ 7.  In turn, NYPD Patrol Guide Procedure No. 204-03 outlines the requirements for a police officer's uniform and states as follows:  "Pregnant uniformed members of the service, who are in their twentieth (20th) week of gestation or earlier, if necessary, will wear business attire and display their identification card . . . on their outermost garment.  Proper business attire will conform with that worn to other official appearances, such as post-arraignment court appearances, professional career interview, etc."  Schmelzer Decl., Ex. Q at 2 (italics and capitalization omitted). Lieutenant Khalaf interpreted this provision to mean that "if somebody is pregnant, they . . . will wear their uniform until the 20th week of gestation or sooner if necessary," where "the 'if necessary' part of [this provision] is to be determined by the supervisor."  Khalaf Dep. at 68-69.

civilian attire and failed to dress into the administrative uniform when instructed to do so."
Schmelzer Decl., Ex. Z.

In relation to the above incident, Guzman testified that Officers Foley, Frykberg, and Greene were not disciplined for wearing civilian attire during their pregnancies.  Guzman Dep. at 166.  Guzman also testified, however, that all three of these Officers' pregnancies occurred before Inspector Barry arrived at the 24th Precinct, and that, after this incident, every pregnant officer was assigned to the telephone switchboard desk and was required to dress in full uniform.  *Id.* at 167-69.

On May 23, 2012, Guzman learned that she had miscarried and took sick leave.  *Id.* at 103, 105.  Upon returning from sick leave several weeks later, Guzman was assigned to work on a foot post.  *Id.* at 106.  She remained assigned to a foot post for a month and a half.  *Id.*  Guzman was never informed as to why she was assigned to a foot post, but believed that the assignment was a form of punishment.  *Id.* at 106, 150-51.  According to Guzman, while being assigned to a foot post did not directly affect her pay or benefits, *id.* at 117, it decreased her opportunities to earn overtime by impeding her ability to make arrests, *id.* at 203-04.  Officer Lisa Mendoza, one of Guzman's colleagues in the 24th Precinct, testified that Guzman was assigned to a foot post more than the typical officer.  Schmelzer Decl., Ex. J (Deposition Testimony of Lisa Mendoza) at 47.

On June 26, 2012, Sergeant Garcia wrote Guzman's name in the "Minor Violations Log" for failing to salute him.  Schmelzer Decl., Ex. X.  According to Guzman, she did salute Sergeant Garcia that day, though he did not see her do so.  Guzman Dep. at 206.  Guzman testified that, while officers are generally required to salute a commanding or supervising officer, *id.* at 207, it was her "belief [that] there was no one else put[ ] in the minor violations log for not saluting [Sergeant Garcia]," *id.* at 206.

On the morning of July 17, 2012, Guzman called into work and requested an "Emergency Day"—a request for leave with less than five days of advance notice—because her daughter was

sick. *Id.* at 53.  Sergeant Herbert told Guzman that she could not take an Emergency Day because she was needed for patrol and there was a patrol car waiting for her. *Id.* at 59.  According to Guzman, Officer Liampachara, a white male colleague, was granted an Emergency Day around the same time when his son had a fever. *Id.* at 64.

Guzman arrived at work at approximately 12:00 p.m. that day and received a "warn and admonish" Command Discipline for arriving late. *Id.* at 60, 64.  A Command Discipline is a written form of discipline that an officer may choose to reject, in which case the officer may be brought up on disciplinary charges and afforded a disciplinary hearing. *Id.* at 41-42.  Guzman rejected the above Command Discipline and, as of the date of her deposition, had not received any penalty for it. *Id.* at 66.

In October 2012, Guzman applied for a transfer to the Police Officers Provide Peer Assistance Unit ("POPPA Unit"), a volunteer group in which police officers provide assistance to fellow officers through a 24-7 hotline. *Id.* at 143.  Although Inspector Barry "recommend[ed]" Guzman for the position, she did not "highly recommend" Guzman, purportedly because of Guzman's refusal to accept the Command Discipline for arriving late on July 17th. *Id.* at 144. Guzman interviewed for the position with Bill Genet, the founder of the POPPA Unit, but her transfer request was ultimately denied. *Id.* at 146.  Other than Genet, Guzman does not know who was involved in the decision to deny her transfer request. *Id.*  Transferring to the POPPA Unit would not have increased Guzman's salary or benefits, and in fact would have decreased her overtime hours and overall income. *Id.* at 146-47, 204.

On her annual performance evaluation for 2012, which was conducted by Sergeant Garcia, Guzman received a rating of 3.5 out of 5. *Id.* at 175.  Sergeant Garcia testified that most officers in his squad received a performance rating between 3.5 and 4.5, and that a rating of 3.5 was considered "good." Garcia Dep. at 24.  Similarly, Guzman testified that some people considered a rating of 3.5

to be "very good." Guzman Dep. at 175.  Guzman nonetheless believed that this rating prevented her from transferring to a different department.  *Id.* at 174.

In March 2013, Lieutenant Khalaf designated Guzman as a "floater" officer, which meant that her assignments varied, and again placed her on a foot post.  *Id.* at 149-50.

On April 22, 2013, Guzman was assigned to meet with an assistant district attorney at the District Attorney's Office.  *Id.* at 155.  After that meeting, Guzman sat in Family Court and waited for the officer with whom she had traveled downtown so that the two of them could return to the precinct together.  *Id.* at 156.  After Lieutenant Khalaf discovered that Guzman was in Family Court, Guzman was issued a Command Discipline for taking an unauthorized meal break, accompanying an officer to a court to which she was not assigned, and failing to report back to command for reassignment after completing her assignment.  Khalaf Dep. at 157.  Guzman conceded that she was not assigned to be in Family Court that day and did not otherwise have permission to be there. Guzman Dep. at 156-57.  According to Guzman, however, waiting for a fellow officer under such circumstances was a standard practice among officers.  *Id.*

On May 6, 2013, Lieutenant Khalaf wrote Guzman's name in the Minor Violations Log for being out of uniform.  Guzman Dep. at 159-60.  According to Guzman, she was wearing the same outfit as Officer Lisa Rodriguez, whom she was relieving, yet Officer Rodriguez was not written up in the Minor Violations Log.  *Id.*

On May 14, 2013, Guzman was speaking to fellow Officer Lisa Mendoza in Spanish while sitting at her assigned post at the telephone switchboard desk.  *Id.* at 51.  Lieutenant Khalaf overheard Guzman speaking in Spanish and believed that, by doing so, she was violating an NYPD policy.  Khalaf Dep. at 176.  Specifically, under the NYPD's English-Only Policy, "[m]embers of the service are required to speak English while they are conducting business for the Department unless speaking a foreign language is a necessary component to performing their duties and

6

responsibilities." Schmelzer Decl., Ex. Y.  Based on his belief that Guzman had violated this policy, Lieutenant Khalaf issued Guzman a "49," which is a letter or memorandum of instruction regarding NYPD policies, as opposed to a form of discipline.  Khalaf Dep. at 176-77.  Officer Mendoza did not receive a 49 in connection with this incident.  *Id.* at 179.

On May 23, 2013, Lieutenant Khalaf wrote Guzman's name in the Minor Violations Log for not having her flashlight at roll call.  Schmelzer Decl., Ex. X.  Guzman conceded that she was required to and did not have her flashlight, *id.* at 30, but asserted that other officers also did not have their flashlights and were not written up in the Minor Violations Log, *id.* at 107-08.

More generally, Lietenant Khalaf conceded that he believed that Guzman "should be more closely monitored" than other officers and that he had instructed Sergeant Garcia to "observe [Guzman] more often" than others.  Khalaf Dep. at 107.  This belief was based on Lieutenant Khalaf's opinion that Guzman was "very disrespectful," and that, "when somebody is disrespectful to a supervisor . . . [or] to their subordinates, they may be disrespectful to the public."  *Id.* at 107-08.  Lieutenant Khalaf also believed that Guzman had "displayed to [him] that she did not have good judgment," such that he "felt that [he] needed to supervise her and make sure that she was where she was supposed to be, doing what she was supposed to be doing and doing it properly."  *Id.* at 128-29.

In a charge filed against the NYPD with the Equal Employment Opportunity Commission ("EEOC") in July 2012 and supplemented in October 2012 and June 2013, Guzman raised allegations of race, sex, gender, and pregnancy discrimination, retaliation, and the creation of a hostile work environment.[3]  Schmelzer Decl., Exs. L, M, N.

---

[3] The record is silent as to how the EEOC resolved this charge or whether it issued Guzman a right-to-sue letter. Defendants have waived any objection that might arise from this absence of evidence by failing to raise such an objection in their motion papers.  *See Pietras v. Bd. of Fire Com'rs of Farmingville Fire Dist.*, 180 F.3d 468, 474 (2d Cir. 1999) ("[A] plaintiff's failure to obtain a notice-of-right-to-sue-letter is not a jurisdictional bar, but only a precondition to bringing a Title VII action that can be waived by the parties or the court.").

## II.    Procedural History

In August 2013, Guzman, through counsel, filed a complaint in this Court raising the claims noted above against the City of New York, the NYPD, NYPD Commissioner Raymond Kelly, Inspector Barry, Lieutenant Khalaf, Sergeants Garcia and Herbert, and Dr. Bello.  Defendants now move for summary judgment, arguing, *inter alia*, that Guzman cannot establish that Defendants discriminated against her based on her race, gender, color, or pregnancy, retaliated against her, or created a hostile work environment under any of the applicable statutes.[4]

## III.    Analysis

### A.    Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted).

To defeat a motion for summary judgment, the defendant "must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  "[M]ere speculation or

---

[4] Defendants also argue that (1) any of Guzman's claims that accrued prior to September 30, 2011 are time-barred; (2) Guzman failed to exhaust her administrative remedies with respect to her claims alleging color discrimination; (3) the City of New York and Commissioner Raymond Kelly cannot be held liable under §§ 1981 or 1983 because there is no evidence of an unconstitutional municipal policy or custom; (4) the individual defendants cannot be held liable under Title VII; and (5) the NYPD is not a suable entity.  The Court agrees with the latter two arguments, which are not opposed by Guzman.  *See Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000) (noting that individuals are not subject to liability under Title VII); *Jenkins v. City of New York*, 478 F.3d 76, 93 n.19 (2d Cir. 2007) (noting that the NYPD is a non-suable agency of the City of New York).  The Court need not address the first three arguments, as all of Guzman's claims are subject to dismissal for the reasons described below.

conjecture as to the true nature of the facts" will not suffice.  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citations and internal quotation marks omitted).  Nor will wholly implausible alleged facts or bald assertions that are unsupported by evidence.  *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986).

### B.        Discrimination Claims under Title VII, the NYSHRL, and §§ 1981 and 1983

Employment discrimination claims brought pursuant to Title VII, the NYSHRL, and §§ 1981 and 1983 are all analyzed under the burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Croons v. New York State Office of Mental Health*, 18 F.Supp.3d 193, 202 (N.D.N.Y. 2014) (citing *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010)).  This framework places the initial burden of establishing a *prima facie* case of discrimination on the plaintiff, who must demonstrate that: (1) she is a member of a protected class; (2) she was qualified for the position in question; (3) she suffered an adverse employment action; and (4) the adverse employment action took place under circumstances giving rise to an inference of discrimination.  *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491-92 (2d Cir. 2010).  If the plaintiff meets this initial burden, the burden shifts to the employer to offer a legitimate nondiscriminatory reason for the adverse employment action.  *Id.* at 492.  If the employer does so, the presumption of discrimination raised by the *prima facie* case is rebutted, and the burden returns to the plaintiff to show that the employer's stated reasons are merely a pretext for discrimination.  *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).

In this case, it is undisputed that Guzman is a member of a protected class and that she is qualified for her position as a police officer.  Defendants argue, however, that Guzman cannot establish that she suffered an adverse employment action or that any of the alleged adverse

employment actions occurred under circumstances giving rise to an inference of discrimination. The Court agrees with this argument for the reasons described below.[5]

### 1.    Adverse Employment Action

An adverse employment action is an action that gives rise to "a materially adverse change in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (internal quotation marks omitted). "To be 'materially adverse,' a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (internal quotation marks omitted). Examples of materially adverse changes include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Id.* (internal quotation marks omitted). "The key . . . is that the plaintiff must show that the [employment action] created a materially significant disadvantage." *Id.* at 641 (internal quotation marks omitted). A plaintiff's "subjective feelings" concerning an employment action cannot establish that the action was materially adverse. *Islamic Soc'y of Fire Dep't Pers. v. City of New York*, 205 F. Supp. 2d 75, 87 (E.D.N.Y. 2002).

Here, Guzman complains that (1) she was temporarily assigned to work in an area of the building that did not have air conditioning while she was pregnant; (2) she was ordered to change into her police uniform while she was pregnant; (3) she was assigned to a foot post for at least a month and a half; (4) her name was written in the Minor Violations Log on multiple occasions for various purported infractions; (5) she was denied an Emergency Day when her daughter was sick; (6) she was issued Command Disciplines for arriving late and for failing to immediately return to the precinct after meeting with an assistant district attorney; (7) her request to transfer to the POPPA

---

[5] In light of this conclusion, the Court is not required to address Defendants argument that there is a legitimate, non-discriminatory reason for each of the alleged adverse employment actions at issue in this case, and that Guzman cannot establish that these reasons are pretextual.

Unit was denied; (8) she received a score of 3.5 out of 5 on her annual performance review; (9) she was not given a steady assignment; (10) she was issued a letter of instruction for purportedly violating the NYPD's English-Only Policy; and (11) she was more closely monitored by her supervisors than other officers.  Guzman has conceded that none of these actions led to a decrease in her salary or a loss in benefits or vacation days, *see* Guzman Dep. at 204-05, and that transferring to the POPPA Unit would not have increased her salary or benefits (and in fact would have decreased her overall income), *id.* at 146-47, 204.

The evidence does not permit a finding that any of the above actions created a materially adverse change in the terms and conditions of Guzman's employment such that they could be deemed adverse employment actions.  *See, e.g., Uddin v. City of New York*, 427 F. Supp. 2d 414, 429 (S.D.N.Y. 2006) ("[R]eprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation." (internal quotation marks omitted)); *Barounis v. New York City Police Dep't*, No. 10 CIV. 2631 SAS, 2012 WL 6194190, at *12 (S.D.N.Y. Dec. 12, 2012) (holding that being written up in the Minor Violations Log, being yelled at in front of co-workers, and being issued Command Disciplines do not amount to adverse employment actions where such measures did not result in penalties or a loss of benefits or time); *Pimentel v. City of New York*, No. 00 CIV 326(SAS), 2002 WL 977535, at *4 (S.D.N.Y. May 14, 2002); ("Denial of requested transfers [that] did not involve an upgrade in position or increase in wages is not an adverse employment action." (internal quotation marks omitted)); *Chukwuka v. City of New York*, 795 F. Supp. 2d 256, 261 (S.D.N.Y. 2011) ("[T]he denial of vacation time does not generally rise to the level of an adverse employment action."); *Guzman v. City of New York*, No. 06-CV-5832 KAM LB, 2010 WL 4174622, at *15 (E.D.N.Y. Sept. 30, 2010) (holding that assigning the plaintiff to a post that lacked air conditioning while she was pregnant did not constitute an adverse employment action and noting

that "[a]n assignment to work at an inferior facility, without more, does not constitute an adverse employment action"); *Weisman v. New York City Dep't of Educ.,* No. 03–CV–9299, 2005 WL 1813030, at *7-8 (S.D.N.Y. Aug. 1, 2005) (holding that an assignment with "difficult working conditions" but without a "diminution in benefits, title, or responsibilities" does not constitute an adverse employment action).

In her opposition brief, Guzman contends that denying her request to transfer to the POPPA Unit constituted an adverse employment action because she was seeking a transfer to both "a better position . . . considering the workload and associated levels of stress" and to "a position more suited to her skills and expertise." Doc. 42 ("Guzman Opp.") at 8 (citing, *inter alia*, *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 255 (E.D.N.Y. 2012) ("In order to constitute an adverse employment action, . . . [an] assignment must be materially less prestigious, materially less suited to [the plaintiff's] skills and expertise, or materially less conducive to career advancement." (internal quotation marks omitted))). Guzman, however, has not offered any objective, admissible evidence that would permit a reasonable juror to make such a comparative assessment of the workload associated with her current position and a position at the POPPA Unit and of her qualifications for each position.

Guzman further argues that her being written up in the Minor Violations Log, being issued Command Disciplines and a letter of instruction, and receiving rating of 3.5 out of 5 on her annual performance review all constituted adverse employment actions because those actions prevented her from transferring to the POPPA Unit. *See* Guzman Opp. at 9-10. Again, however, Guzman has not offered any objective, admissible evidence that would permit a reasonable juror to make such a finding. *See, e.g., D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) ("The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful."); *Weinstein v. Garden City Union*

*Free Sch. Dist.*, No. CV 11-2509 AKT, 2013 WL 5507153, at *29 (E.D.N.Y. Sept. 30, 2013) ("[A] plaintiff cannot rely on their own speculative, and subjective, testimony to defeat a motion for summary judgment." (internal quotation marks omitted)).  Furthermore, Guzman has not cited any authority for the proposition that reprimands and performance reviews constitute adverse employment actions where they play a role in the denial of a plaintiff's lateral transfer request.

Finally, Guzman argues that her assignment to a foot post constituted an adverse employment action because it diminished her opportunities to make arrests and thereby earn overtime.  Guzman Opp. at 9.  This argument, too, is unavailing on the ground that it is unduly speculative and unsupported by objective evidence.  *See Roman-Malone v. City of New York*, No. 11 CIV. 8560 PAC, 2013 WL 3835117, at *6 (S.D.N.Y. July 25, 2013) (rejecting the plaintiff's assertion that "assignment to [a] foot post . . . reduced [her] ability to earn overtime" as lacking a sufficient factual basis.).  Accordingly, Guzman cannot establish that any of the conduct of which she complains resulted in a materially adverse change in the terms and conditions of her employment, and thus her discrimination claims under Title VII, the NYSHRL, and §§ 1981 and 1983 must fail.

## 2.   Inference of Discrimination

In any event, even assuming, *arguendo*, that Guzman could demonstrate that she suffered from an adverse employment action, she cannot demonstrate that this action occurred under circumstances giving rise to an inference of discrimination based on her membership in a protected class.  "A plaintiff can establish an inference of discrimination through direct evidence of discriminatory intent, or through circumstantial evidence demonstrating that the employer treated plaintiff less favorably than a similarly situated employee outside of his protected group."  *Jean v. Acme Bus Corp.*, No. CV 08-4885 ARL, 2012 WL 4171226, at *8 (E.D.N.Y. Sept. 19, 2012).  Guzman has not presented any direct evidence of discriminatory intent, and relies on the following circumstantial evidence in her opposition papers:  (1) Officer Mendoza's testimony that she did not

receive a letter of instruction for speaking to Guzman in Spanish on May 14, 2013; (2) Officer

Mendoza's testimony that Guzman was assigned to a foot post more often than the typical officer;

(3) Guzman's testimony that she was the only officer who was written up for not having her

flashlight on May 23, 2013; (4) Guzman's testimony that waiting for a fellow officer after meeting

with a district attorney was a common practice; (5) Sergeant Garcia's testimony that Lieutenant

Kahalf instructed him to ensure that Guzman wore her uniform while pregnant on May 22, 2012; (6)

Guzman's testimony that Officer Liampachara, a white male colleague, was granted an Emergency

Day around the same time that she was denied an Emergency Day; and (7) Guzman's testimony that

Officers Foley, Frykberg, and Greene, all of whom are white, were assigned "a nice little cushy office

where they [could] perform their duties and not be stressed with the [telephone switchboard]"

during their pregnancies.  *See* Guzman Opp. at 10-14.

 Addressing this evidence in turn, Officer Mendoza, like Guzman, identifies as a Hispanic

female.  *See* Mendoza Dep. at 59.  Consequently, Guzman's suggestion that Officer Mendoza was

treated favorably because she did not receive a letter of instruction for speaking Spanish on May 14,

2013 in fact undermines Guzman's race and gender discrimination claims.  *See, e.g., Turner v. Eastconn*

*Reg'l Educ. Serv. Ctr.,* No. 12–CV–788, 2013 WL 1092907, at *8–9 (D. Conn. Mar. 15, 2013) (holding

that the plaintiff's allegation that a member of her same protected class "received favorable

treatment would undermine any inference that the [d]efendants were motivated by [discriminatory]

animus").

 As to the next three portions of testimony, Guzman has offered no evidence regarding the

identities, races, or genders of any similarly situated employees who were assigned to a foot post less

frequently than her or who were not disciplined for failing to immediately return to the precinct or

for failing to carry a flashlight.  The testimony at issue thus plainly cannot demonstrate that

Defendants treated Guzman less favorably than a similarly situated employee outside of her protected group.

Regarding Lieutenant Khalaf's directive that Guzman change into her uniform while pregnant, the record demonstrates that Lieutenant Khalaf issued this directive because it was consistent with his understanding of the applicable Patrol Guide Procedures, not because of any pregnancy-related animus.[6]  *See* Khalaf Dep. at 67-68.  To the extent Guzman may disagree with Lieutenant Khalaf's understanding of those Procedures, such a disagreement is irrelevant to her discrimination claims.  *See, e.g., DeLuca v. Allied Domecq Quick Serv. Restaurants*, No. 03-CV-5142 (JFB)(AKT), 2006 WL 1662611, at *9 (E.D.N.Y. June 13, 2006) (noting that an employer may carry out an adverse employment action "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason" (internal quotation marks omitted)).

With respect to Guzman's testimony that she was treated less favorably than Officer Liampachara, a white male, when she was denied an Emergency Day, Guzman also testified that she did not know the date on which Officer Liampachara was granted an Emergency Day or who he spoke to when making the request.  *See* Guzman Dep. at 64.  The Court agrees with Defendants that, because Guzman has not offered "any evidence that the same supervisor granted this male officer the same day off that she was denied," and because Guzman has not offered any evidence regarding "the needs of the precinct . . . on the day this male officer was granted the day off as compared to the day [her request] was denied, [Guzman] cannot raise any inference of discrimination based on any purported difference in treatment."  Doc. 33 ("Def. Mot.") at 13;

---

[6] Throughout her opposition papers, Guzman repeatedly references testimony by Lieutenant Khalaf that he did not believe that Guzman was pregnant when he ordered her to change into her uniform.  *See, e.g.,* Guzman Opp. at 12-13; *see also* Khalaf Dep. at 84-85.  The Court does not understand how such testimony suggests that Lieutenant Khalaf discriminated against Guzman based on her pregnancy status in connection with this incident.  *See* Khalaf Dep. at 125 ("I went by the assumption that she was pregnant and I treated her as such.  Whether I believed it – you asked me what I believed, and I told you [that I did not believe it], but I go by the assumption that she is pregnant.").

*Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (holding in this context that "the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases").

Similarly, regarding Guzman's testimony that she was treated less favorably than Officers Foley, Frykberg, and Greene, all of whom are white females, when she was assigned to work at a telephone switchboard desk without air-conditioning while pregnant, there is no evidence as to the dates on which those employees were pregnant, who assigned them to work in an office, or the circumstances under which they were so assigned. *See* Guzman Dep. at 167 (acknowledging that "when you get pregnant [the NYPD] place[s] you based on need"). Moreover, Guzman testified that neither Sergeant Garcia, Lieutenant Khalaf, nor Inspector Barry were her supervisors at the time that this assignment occurred. *Id.* at 128-29, 167-69; *White v. Conn., Dep't of Corr.,* No. 08–CV–1168, 2010 WL 3447505, at *6 (D.Conn. Aug. 24, 2010) ("To be considered similarly situated, an individual must have been treated more favorably by the same decisionmaker that dealt with the plaintiff.").

In any event, the issue of whether Guzman's assignment to a switchboard desk in July and August of 2010 was discriminatory is ultimately moot, as a reasonable juror could not find that this assignment constituted an adverse employment action and Guzman does not argue otherwise in her counseled opposition papers. *See Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.").[7] Accordingly, Guzman

---

[7] Similarly, while Guzman focuses on arguing that the denial of her request to transfer to the POPPA Unit constituted an adverse employment action, she does not argue that this denial occurred under circumstances giving rise to an inference of discrimination.

cannot establish that she suffered an adverse employment action that occurred under circumstances giving rise to an inference of discrimination.

### C.      Retaliation Claims under Title VII, the NYSHRL, and §§ 1981 and 1983

Retaliation claims under Title VII, the NYSHRL, and §§ 1981 and 1983,[8] are all analyzed under the burden-shifting framework described above.  *See Giscombe v. New York City Dep't of Educ.*, 39 F.Supp.3d 396, 401, 406 (S.D.N.Y. Aug. 12, 2014) (Title VII and § 1983); *Moore v. Metro. Transp. Auth.*, 999 F. Supp. 2d 482, 504 (S.D.N.Y. 2013) (NYSHRL); *Azkour v. Haouzi*, No. 11 CIV. 5780 RJS KNF, 2012 WL 1658349, at *5 (S.D.N.Y. May 11, 2012) (§ 1981).  In order to establish a *prima facie* case of retaliation, a plaintiff must demonstrate that (1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the plaintiff suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action.  *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010).  If the plaintiff meets this burden, the employer must offer a legitimate non-retaliatory reason for the adverse employment action.  *Id.* at 552-53.  If the employer does so, the burden returns to the plaintiff to demonstrate that the employer's proffered non-retaliatory reason is merely a pretext for retaliation.  *Id.* at 553.

As to the first element of the *prima facie* case, "[t]he term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination," *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000), *superseded by statute on other grounds by* N.Y.C. Local L. No. 85, and may take the form of either formal or informal complaints, *Conway v. Microsoft Corp.*, 414 F.Supp.2d 450, 466 (S.D.N.Y. 2006).  An employee's complaint qualifies as protected activity only if "the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the

---

[8]To the extent Guzman intends to raise a § 1983 retaliation claim to vindicate rights conferred by the equal protection clause, as opposed to the First Amendment, it is not clear whether such a claim exists.  *See generally Giscombe v. New York City Dep't of Educ.*, 39 F.Supp.3d 396, 404-05 (S.D.N.Y. Aug. 12, 2014) (discussing the discrepancies in the Second Circuit's case law regarding this issue).  The Court, however, need not resolve this question here.  Assuming, *arguendo*, that such a claim exists, it cannot be established by Guzman for the reasons described below.

law." *Kelly v. Howard I. Shapiro & Associates Consulting Engineers, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (internal quotation marks omitted). "A plaintiff's belief on this point is not reasonable simply because he or she complains of something that appears to be discrimination in some form." *Id.* at 15. For example, in a case in which a plaintiff asserted that he had been terminated for complaining that a white employee had been "chosen over qualified black and other minority applicants," the Second Circuit held that the plaintiff had failed to make out a *prima facie* case of retaliation because his "objections at the time neither pointed out discrimination against particular individuals nor discriminatory practices by [the employer]" and were thus "directed at something that, as it was alleged, is not properly within the definition of an 'unlawful employment practice.'" *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593-94 (2d Cir.1988) (quoting 42 U.S.C. § 2000e-2 (j) (1982)).

As to the second element of the *prima facie* case, "implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by [the statute at issue]." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998).

In this case, though Guzman filed an EEOC charge and supplemented that charge twice, *see* Schmelzer Decl., Exs. L, M, N, she testified that her retaliation claim is premised on the incident that occurred on May 22, 2012, in which she was ordered to change into her police uniform while pregnant, *see* Guzman Dep. at 106-07, 219. Similarly, while Guzman notes in her counseled opposition brief that she filed and supplemented an EEOC charge, *see* Guzman Opp. at 19, she does not argue that there was a causal connection between the filing or supplementing of that charge and an adverse employment action. Rather, consistent with her testimony, she argues only that there was a causal connection between the incident that occurred on May 22, 2012—which she contends

18

qualifies as a protected activity—and certain allegedly adverse employment actions at issue in this case. *See id.* at 20-22. The Court is thus satisfied that, to the extent Guzman originally intended to claim that she was retaliated against for filing or supplementing an EEOC charge, that claim has been abandoned. *See Jackson*, 766 F.3d at 198.

No reasonable juror could find that Guzman's conduct in connection with the incident that occurred on May 22, 2012 constituted protected activity or that Defendants could reasonably have understood that such conduct constituted protected activity. To reiterate this incident in a summary fashion, Guzman initially objected to an order that she change from civilian attire into her police uniform while she was pregnant on the ground that the pregnancy desk had informed her that she was permitted to wear civilian attire. Guzman Dep. at 94-95. Guzman nonetheless attempted to comply with this order but discovered that her pants did not fit. *Id.* Guzman was then asked to try on a different pair of pants under the supervision of a female colleague but ultimately suffered an anxiety attack. *Id.* Although the Court understands that this was an extremely stressful ordeal for Guzman and does not intend to trivialize it, the Court cannot comprehend how any of Guzman's actions throughout this incident could constitute actions taken to oppose statutorily prohibited discrimination, on the basis of pregnancy or otherwise. To the extent the relevant conduct was Guzman's initial objection to the order that she change into her police uniform while pregnant, there are no factual or legal grounds for concluding that Guzman's objection was based on a good faith, reasonable belief that this order discriminated against her based on her pregnancy status. *See Kelly*, 716 F.3d at 14.

In arguing that she engaged in protected activity in connection with this incident or that Defendants could reasonably have understood that she engaged in protected activity, Guzman notes that she testified that Sergeant Merkoski contacted the NYPD Office of Equal Employment Opportunity ("OEEO") after the incident occurred. Guzman Opp. at 21; Guzman Dep. at 228. As

Defendants note in their reply brief, however, Guzman did not testify that Sergeant Merkoski contacted the OEEO specifically because of this incident, and there is otherwise no evidence in the record as to why Sergeant Merkoski contacted the OEEO.  Doc. 46 at 7.  The testimony referenced by Guzman thus is not in any way probative of whether she engaged in a protected activity or whether Defendants were aware of such activity in connection with the incident at issue. Accordingly, Guzman cannot establish either of the first two elements of her *prima facie* case with respect her retaliation claims, and those claims must fail.

### D.  Hostile Work Environment Claims under Title VII, the NYSHRL, and §§ 1981 and 1983

In order to establish a hostile work environment claim, a plaintiff must demonstrate that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006) (internal quotation marks omitted).  The plaintiff "must show not only that she subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive." *Id.*  To analyze a hostile work environment claim, the court must "look to the record as a whole and assess the totality of the circumstances, considering a variety of factors including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (citation and internal quotation marks omitted).

Significantly, a plaintiff bringing a hostile work environment claim must demonstrate that the hostile conduct at issue was carried out *because of* her membership in a protected class.  *See Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007).  Anti-discrimination statutes do not "set forth a general civility code for the American workplace." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted) (referring to Title VII); *accord Alfano v. Costello*, 294 F.3d at

365, 377 (2d Cir. 2002) ("Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals.").

In this case, Guzman has offered evidence indicating, at best, that Defendants supervised her more closely than her colleagues and unevenly issued her various reprimands and undesirable assignments. For the reasons already indicated, however, the record is devoid of evidence that Defendants carried out such conduct because of Guzman's color, race, gender, or pregnancy status. Lieutenant Khalaf testified, for instance, that Guzman was more closely supervised because he believed that she was "disrespectful" and "did not have good judgment." Khalaf Dep. at 107-08, 128-29. Whether these beliefs were accurate is beside the point; Guzman has offered no evidence indicating that they were not honestly held. *Cf. Casseus v. Verizon N.Y., Inc.*, 722 F. Supp. 2d 326, 341 (E.D.N.Y. 2010) ("[A]n employer's belief that an employee engaged in misconduct need not be correct, only honestly held."). Notably, in her opposition papers, Guzman does not respond to Defendants' argument there is no evidence of a link between the alleged hostile conduct at issue and her membership in a protected class. *See* Def. Mot. at 23; Guzman Opp. at 17-18. The Court thus has no trouble concluding that Guzman's hostile work environment claims must fail on this ground. *See Nwanji v. City of New York*, 98 Civ. 4263(RLE), 2000 WL 1341448 at *3, *5 (S.D.N.Y. Sept. 15, 2000) ("While [plaintiff] did present ample evidence that his supervisors were constantly reprimanding him and documenting his poor work performance, this evidence, absent a showing of discriminatory animus, does not support a hostile work environment claim.").

E.    **Claims under the NYCHRL**

Federal district courts have supplemental jurisdiction over state-law claims "that are so related to" federal claims "that they form part of the same case or controversy." 28 U.S.C § 1367(a). Such jurisdiction, however, is "discretionary," *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997), and a district court "may decline to exercise supplemental jurisdiction over a claim" if it "has dismissed all claims over which it has original jurisdiction," 28 U.S.C. § 1367(c).

"The NYCHRL explicitly requires an independent liberal construction analysis in all circumstances, an analysis that must be targeted to understanding and fulfilling what the statute characterizes as the [NYCHRL's] uniquely broad and remedial purposes, which go beyond those of counterpart state or federal civil rights laws." *Armstrong v. Metro. Transp. Auth.*, No. 07 CIV. 3561 DAB, 2015 WL 992737, at *5 (S.D.N.Y. Mar. 3, 2015) (internal quotation marks omitted); *see also Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,* 715 F.3d 102, 109 (2d Cir. 2013) ("[C]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing the NYCHRL's provisions broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." (citation and internal quotation marks omitted)). As a result, while "[c]ourts in this District tend to retain jurisdiction over NYSHRL claims when deciding federal discrimination claims on the merits," *Otegbade v. New York City Admin. for Children Servs.*, No. 12 CIV. 6298 KPF, 2015 WL 851631, at *4 (S.D.N.Y. Feb. 27, 2015), they frequently decline to exercise supplemental jurisdiction over NYCHRL claims, *see, e.g., Vuona v. Merrill Lynch & Co., Inc.*, 919 F.Supp.2d 359, 393-94 (S.D.N.Y. 2013) (resolving NYSHRL claims together with Title VII claims, while declining to exercise supplemental jurisdiction over NYCHRL claims); *Brown v. City of New York*, No. 14 CIV. 2668 PAE, 2014 WL 5394962, at *8 n.8 (S.D.N.Y. Oct. 23, 2014) (same).

In light of this law and the Court's dismissal of all of Guzman's federal claims, the Court declines to exercise supplemental jurisdiction over Guzman's claims under the NYCHRL.

## IV.    Conclusion

For the foregoing reasons, Defendants' summary judgment motion is granted with respect to Guzman's claims under Title VII (as amended by the PDA), the NYSHRL, and §§ 1981 and 1983, and those claims are dismissed with prejudice.  The Court declines to exercise supplemental jurisdiction over Guzman's claims under the NYCHRL and dismisses those claims without prejudice.  The Clerk of Court is directed to enter judgment accordingly and to close the case.

SO ORDERED.

Dated:  March 18, 2015
New York, New York

_____
GREGORY H. WOODS
United States District Judge